UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISHNA LUNCH OF SOUTHERN CALIFORNIA, INC., Plaintiff, v. MICHAEL J. BECK, Defendant. | CV 22-8265 DSF (PLAx) ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (Dkt. 13) |

Plaintiff Krishna Lunch of Southern California Inc. is a nonprofit religious corporation. Defendant Michael Beck is the Administrative Vice-Chancellor at the University of California, Los Angeles (UCLA) and is involved in the decision making for the permit Krishna Lunch seeks. Krishna Lunch brought this lawsuit against Beck in his official capacity for abridgement of its First Amendment rights. Krishna Lunch now moves for a preliminary injunction. Dkt. 13 (Mot.). Beck opposes. Dkt. 21 (Opp'n). For the reasons stated below, Krishna Lunch's Motion is DENIED.

## I. Background

Krishna Lunch "adheres to the evangelical teachings of Krishna consciousness, a religion within 'the broad theological umbrella of the Vaishnava tradition of Bhakti Hinduism." Dkt. 1 (Compl.) ¶ 16. A core tenet of the religion requires followers to meet, interact, and educate people "about the beliefs and practices of Krishna consciousness, including such issues as global warming and climate change, vegetarianism and veganism, animal protection, God-centered ecology, the relationship between science and religion, and the origin of life and

the universe." Id. ¶ 17. A core practice of Krishna consciousness is the consumption, distribution, and sharing of sanctified vegetarian and vegan food referred to as prasadam or prasāda. Id. ¶ 18.

In furtherance of its religion mission, Krishna Lunch seeks to distribute its sanctified food on the UCLA campus three hours a day twice a week in Bruin Plaza. Id. ¶ 24. Krishna Lunch's attempts to serve prasadam on campus are not new. Krishna Lunch first sought permission from UCLA in February 2016 to serve prasadam on the Bruin Walk East. Id. ¶ 25. This resulted in a protracted legal battle. See C.D. Cal. Case No. 2:16-cv-8422. The Ninth Circuit eventually found that some of Krishna Lunch's First Amendment claims survived the motion to dismiss phase. Krishna Lunch of S. Cal., Inc. v. Gordon, 797 Fed. Appx. 311, 313 (9th Cir. 2020). Shortly after the Ninth Circuit's January 2020 opinion was issued, the COVID-19 pandemic hit. UCLA joined universities around the country in shutting down its campus and closing food service. C.D. Cal. Case No. 2:16-cv-8422, Dkt. 77. The litigation subsequently stalled until Krishna Lunch filed a fourth amended complaint with claims predicated on UCLA's *complete bans* of food service on its campus. Id. at Dkt. 87. This Court ultimately granted a motion for judgment on the pleadings by the defendants in that action in April 2022 because the complete bans due to COVID-19 had been withdrawn. Id. at Dkt. 119.

On May 3, 2022, the UCLA Events Department granted Krishna Lunch provisional approval to serve prasadam twice a week during spring quarter on the Bruin Walk East. Compl. ¶¶ 26, 28. That approval was extended to the summer quarter and ultimately expired on September 15, 2022. Id. ¶¶ 27-28. On August 22, 2022, Krishna Lunch inquired about approval to serve prasadam for the fall quarter which was set to start September 19, 2022. Id. ¶ 29. After several inquiries by Krishna Lunch, a meeting took place between UCLA officials and Krishna Lunch on September 22. At this meeting, Krishna Lunch was informed that there would be a $500 permit fee per day and no location was finalized. Id. ¶ 32. On September 29, 2022, Krishna Lunch requested to serve food at the *Bruin Plaza* and informed UCLA that it could not afford the $500 permit fee. Id. ¶ 33.

UCLA indicated that it would not waive the permit fee. Id. ¶ 34. UCLA also restricted Krishna Lunch to 4-days a quarter. Id. ¶¶ 5, 8, 44, 46, 51.

Krishna Lunch filed this action under 42 U.S.C. § 1983 alleging violations of freedom of speech and of assembly and association. Krishna Lunch requested injunctive relief.

## II. Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as a matter of right." Winter v. Natural Res. Def. Council, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Id. at 20. Where the federal government is the opposing party, the balance of equities and public interest factors merge. Nken v. Holder, 556 U.S. 418, 435 (2009). Although a plaintiff seeking a preliminary injunction must make a showing on each factor, the Ninth Circuit employs a "version of the sliding scale" approach where "a stronger showing of one element may offset a weaker showing of another." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131-35 (9th Cir. 2011). Under this approach, a court may issue a preliminary injunction where there are "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff . . . , so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Id. at 1135 (internal quotation marks omitted).

## III. Analysis

### A.   Relief Sought

As an initial matter, Beck argues the injunctive relief is not appropriate because Krishna Lunch has requested a location for the lunch program not pleaded in the Complaint. Opp'n at 16. "[T]here must be a relationship between the injury claimed in the motion for

3

injunctive relief and the conduct asserted in the underlying complaint. . . . Absent that relationship or nexus, the district court lacks authority to grant the relief requested." Pac. Radiation Oncology, LLC v. Queen's Med. Ctr., 810 F.3d 631, 636 (9th Cir. 2015).

Krishna Lunch is inconsistent in whether it seeks to operate its program at the Bruin Walk or Bruin Plaza. But this is not fatal to its Motion. The claims in its Complaint are clearly centered on Bruin Plaza. See, e.g., Compl. ¶¶ 2, 44. Bruin Walk is only identified as the location of the lunch program during the spring and summer. See, e.g., Compl. ¶¶ 25, 28, 33. Krishna Lunch's Motion seems to seek both locations at different points, asking for the old terms to be reinstated (Bruin Walk), but then discounting potential issues that might be raised as to Bruin Plaza. Mot. at 1, 15, Dkt. 23 (Reply) at 5-8. Ultimately, however, it seems clear that Krishna Lunch is seeking an injunction against the 4-day-a-quarter restrictions and the $500 fee. Both limitations are associated only with Bruin Plaza: Bruin Walk was not made available at all for the fall. Dkt. 13-2 (Brown Decl.) ¶ 17. The Court, therefore, construes the request as a request to set up the lunch program at Bruin Plaza. This is consistent with the request in its Complaint and is emphasized in the Reply.

### B. Merits

Krishna Lunch has not shown that there are serious questions going to the merits.

#### 1. Expressive Conduct

The First Amendment prohibits laws "abridging the freedom of speech." U.S. Const. amend. I. "The First Amendment clearly includes pure speech, but not everything that communicates an idea counts as 'speech' for First Amendment purposes." Anderson v. City of Hermosa Beach, 621 F.3d 1051, 1058 (9th Cir. 2010). Expressive conduct is constitutionally protected if it is "sufficiently imbued with elements of communication," meaning "an intent to convey a particularized message is present, and the likelihood is great that the message will be understood by those who view it." Id. (internal quotation marks

omitted) (quoting Spence v. Washington, 418 U.S. 405, 409-11 (1974) (per curiam)).  Serving food is not pure speech, it must meet the test for expressive conduct to qualify for protection.

Here Beck disputes whether Krishna Lunch's message is likely to be understood by viewers.  The Ninth Circuit previously held that "an onlooker would understand the distribution of food to be communicative" because "[w]hile distributing prasada, the organization plans on chanting the names of God and other devotional hymns and songs, speaking with interested students and others of the University of California, Los Angeles ('UCLA') community, distributing religious literature, and displaying signs depicting reincarnation, animal protectionism, and other topics related to its followers' beliefs." Krishna Lunch of S. Cal., Inc., 797 Fed. Appx. at 314.

Several changes to the facts and procedural posture warrant a different result here.  First, this case is at a different stage.  A merely plausible pleading is not sufficient to warrant a preliminary injunction.  Krishna Lunch must demonstrate a "great likelihood" that its messages "will be understood by those who view them."  Edge v. City of Everett, 929 F.3d 657, 669 (9th Cir. 2019) (vacating a preliminary injunction).  The Court considers not whether individuals on campus would understand the particular message of Krishna Consciousness, but whether they would understand that the food service is *a* symbolic message.  See Knox v. Brnovich, 907 F.3d 1167, 1181 (9th Cir. 2018) (finding plaintiff did not meet her burden to demonstrate that her message "would reasonably be understood by viewers as conveying any of [her claimed] messages or conveying a symbolic message of any sort").

Second, some of the facts that motivated the Ninth Circuit's prior decision are in dispute or no longer present.  Krishna Lunch has not mentioned any signage that they are planning to use this time around.  There are also no facts about chanting or singing.  Chansoth Hill, UCLA's Director at the Events Office, observed the lunch program over the summer.  Dkt. 21-4 (Hill Decl.) ¶ 11.  He "did not witness chanting of the names of God or the singing of hymns or songs by Krishna Lunch

5

volunteers or others. [He] did not see or hear Krishna Lunch volunteers speaking with interested students about Krishna consciousness, except when Govinda spoke to [Hill]." Id. What he did see was "Krishna Lunch distributing food and receiving payment from students and others." Id. Krishna Lunch responds that it passed out religious literature to students who received lunches. Dkts. 23-2; 23-3; 23-4; 23-5; 23-6; 23-7 (declarations from students who received meals and religious literature). Passing out pamphlets and literature to some of the students is its own form of pure speech. Without more context it is insufficient to show at the preliminary injunction stage that the food service is itself expressive and its message would be understood by those who viewed it. Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 66 (2006) ("The fact that such explanatory speech is necessary is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection under O'Brien. If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it.").

### 2. Forum

Even assuming that the lunch program is expressive conduct warranting First Amendment protection, Krishna Lunch's Motion still falls short.

"The first step in assessing a First Amendment claim relating to private speech on government property is to identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." Ariz. Life Coal. Inc. v. Stanton, 515 F.3d 956, 968 (9th Cir. 2008) (internal quotation marks omitted). The forum is defined by the access sought by the speaker. Where the speaker seeks "general access to public property, the forum encompasses that property" but where "limited access is sought," there is a more tailored approach. Cornelius v. NAACP Legal Def. & Educ. Fund, 473 U.S. 788, 801 (1985). Here, the forum is Bruin Plaza.

There have historically been three types of fora: "public fora, designated public fora, and nonpublic fora." Flint v. Dennison, 488 F.3d 816, 830 (9th Cir. 2007) (internal quotation marks omitted). There is also a fourth category known as the limited public forum. This category "allows the government to open the non-public forum for limited purposes" and occurs when the government intentionally opens a space "to certain groups or to certain topics." Id. (internal quotation marks omitted). If Bruin Plaza is considered a traditional or designated public space, the constitutionality of any UCLA policy must be "narrowly tailored to serve a significant government interest, and leave[] open ample alternative channels of communication." Flint, 488 F.3d at 830 (internal quotation marks omitted). Speech restrictions in a limited public forum, however, are constitutional so long as they "(1) comport with the definition of the forum . . .; (2) are reasonable in light of the purpose of the forum; and (3) do not discriminate by viewpoint." OSU Student Alliance v. Ray, 699 F.3d 1053, 1062 (9th Cir. 2012). Regulation of speech in a non-public forum need only be reasonable and viewpoint neutral. Faith Ctr. Church Evangelistic Ministries v. Glover, 462 F.3d 1194, 1203 (9th Cir. 2006).

### a. Bruin Plaza is Not a Traditional Public Forum

Krishna Lunch first argues that Bruin Plaza is a traditional public forum. Reply at 6-8. The Court disagrees. The Ninth Circuit has not squarely addressed whether a public university campus is a traditional public forum. OSU Student Alliance, 699 F.3d at 1063 n.4 ("we need not decide whether the campus is a traditional public forum."). But it has recognized that while a university campus "*may* be traditional public fora *for students*" a "university retains the power to foster an atmosphere and conditions in which its educational mission can be carried out." Id. (internal quotation marks omitted) (emphasis added).

Likewise, the Supreme Court has not directly addressed the issue, but dicta supports the conclusion that university campuses in general are not traditional public fora. In Widmar the Court noted that "[a] university differs in significant respects from public forums such as streets or parks or even municipal theaters. . . . We have not held, for

7

example, that a campus must make all of its facilities equally available to students and nonstudents alike, or that a university must grant free access to all of its grounds or buildings." Widmar v. Vincent, 454 U.S. 263, 267 n.5 (1981). Justice Stevens further noted in his concurrence:

> Today most major colleges and universities are operated by public authority. Nevertheless, their facilities are not open to the public in the same way that streets and parks are. University facilities -- private or public -- are maintained primarily for the benefit of the student body and the faculty . . . . Because every university's resources are limited, an educational institution must routinely make decisions concerning the use of the time and space that is available for extracurricular activities."

Id. at 278 (Stevens, J., concurring). Nowhere has the Supreme Court suggested that anyone "has an absolute constitutional right to use all parts of a school building or its immediate environs for his unlimited expressive purposes." Grayned v. City of Rockford, 408 U.S. 104, 117-18 (1972) (finding that expressive activity by the public on sidewalks adjacent to high school could be prohibited if it "materially disrupts classwork or involves substantial disorder or invasion of the rights of others.") (internal quotations omitted).

The traditional public forum analysis indicates that Bruin Plaza is indeed not a public forum. In evaluating whether an area is a traditional public forum, courts consider three factors:

> 1) the actual use and purposes of the property, particularly status as a public thoroughfare and availability of free public access to the area;
> 2) the area's physical characteristics, including its location and the existence of clear boundaries delimiting the area; and
> 3) traditional or historic use of both the property in question and other similar properties.

ACLU of Nevada v. City of Las Vegas, 333 F.3d 1092, 1100 (9th Cir. 2003).

The first factor weighs against considering Bruin Plaza a public forum. The primary purpose of a university campus is to serve its student body and its faculty. Int'l Soc'y for Krishna Consciousness v. Lee, 505 U.S. 672, 682 (1992) (finding the purpose of a terminal did not satisfy the standards for identifying as a public forum because "the purpose of the terminals" is "the facilitation of passenger air travel, not the promotion of expression.").

The public access to the Bruin Plaza does not transmute this purpose. Jacobsen v. Bonine, 123 F.3d 1272, 1273 (9th Cir. 1997) ("not all publicly owned property becomes a public forum simply because the public is permitted to come and go at the site") (internal quotation marks omitted). This is particularly so where the public access is constrained. United States v. Kokinda, 497 U.S. 720, 729 (1990) ("the power of the Fort's commanding officer summarily to exclude civilians from the area of his command demonstrated" that the idea that the area was a public forum was "'constitutionally false'") (quoting Greer v. Spock, 424 U.S. 828, 851 (1976)). While UCLA is open to the public, public access to the University and Bruin Plaza is constrained. UCLA can and does close the Bruin Plaza to the public. Dkt. 21-2 (Deluca Decl.) ¶ 10. UCLA also places various specific limitations on public access to the campus, such as times the public may be there and what they may do on the property. See, e.g., Id. Ex. 1 (UCLA Regs.) at 2-3 (grounds are closed to the public from midnight to 6 am); 38-46 (addendum of regulations governing non-affiliates).[1] The first factor,

---

[1] They are a variety of other limitations placed on speech, Bruin Plaza, and public access to the campus. See, e.g., UCLA Regs at 8 (non-affiliates cannot "solicit, hawk, or otherwise peddle or rent any goods, wares, merchandise, liquids, or edibles for human consumption or services . . . operate any commercial enterprise, or give any lessons, classes or instruction . . . whether for profit or otherwise, except those specifically authorized by the University"); at 13 ("No non-affiliate of the University shall hold or conduct any demonstration or gathering in or upon University Property without prior

9

therefore, weighs against classifying Bruin Plaza as a traditional public forum.

As to the second factor, the Court is unpersuaded that any physical characteristics push Bruin Plaza into the category of traditional public forum. Physical features that serve as an "indication [ ] to persons . . . that they have entered some special type of enclave" are at odds with the notion of a public forum. United States v. Grace, 461 U.S. 171, 180 (1983). Features such as design and architecture can define an area as a special enclave and make it distinguishable from other public spaces. Compare Id. (finding the sidewalk in front of the Supreme Court was a public forum because "[t]he sidewalks comprising the outer boundaries of the Court grounds are indistinguishable from any other sidewalks in Washington, D.C.") with Hodge v. Talkin, 799 F.3d 1145, 1158 (D.C. Cir. 2015) (finding the Supreme Court *plaza* was not a public forum because the "appearance and design vividly manifest its architectural integration with the Supreme Court building, as well as its separation from the perimeter sidewalks and surrounding area"). Krishna Lunch's physical description of Bruin Plaza is limited. Bruin Plaza is "[l]ocated in the center of campus" and the lunch program would be near a bear statue in the Plaza. Reply at 7; Mot. at 15. Krishna Lunch includes a single aerial photo of Bruin Plaza. Brown Decl. Ex H. Any person standing in the pictured Bruin Plaza would know he was on a university campus and not, for example, on an ordinary public sidewalk. This factor weighs against finding Bruin Plaza to be a traditional public forum.

The third factor also tilts toward UCLA. The traditional and historic use of universities is primarily for the benefit of their student body. Widmar, 454 U.S. at 278 (Stevens, J., concurring). Although

---

written approval from the UCLA Events Office"); at 20 ("Programmable Outdoor Areas," "Scheduling of Bruin Plaza for use by Registered Campus Organizations is coordinated by CSP," "Use of outdoor areas must not interfere with the orderly operation of the campus or unreasonably disrupt the peace and quiet of the campus and the community adjacent to the campus.").

Bruin Plaza may be open to occasional public events, Reply at 7, it is used by students and university departments for their events. Opp'n at 3. Bruin Plaza is not a traditional public forum for the general public.

                b.      <u>UCLA Intended to Open Bruin Plaza as a Limited Public Forum</u>

Krishna Lunch's backup argument is that Bruin Plaza is a designated public forum because the campus regulations state that UCLA "is committed to assuring that all persons may exercise the constitutionally protected rights of free expression, speech, assembly, and worship." Reply at 8-10 (quoting Campus Regs. §I). To create a designated public forum, the government actor must intend to open a space to general access. University policies can transform a campus into a designated public forum. <u>OSU Student Alliance</u>, 699 F.3d at 1062-63 (finding that Oregon Administrative Rules indicated that Oregon State University had "intentionally dedicated campus property to expressive conduct, thereby create[ed] a designated public forum") (internal citations omitted). "In contrast, when the government intends to grant only 'selective access,' by imposing either speaker-based or subject-matter limitations, it has created a limited public forum." <u>Seattle Mideast Awareness Campaign v. King Cnty.</u>, 781 F.3d 489, 497 (9th Cir. 2015).

Several factors here show that, while UCLA intended to open its campus, it intended to do so in a limited capacity. First, intent is evidenced by the terms and policies the government "has adopted to govern access to the forum. If the government requires speakers seeking access to obtain permission, under pre-established guidelines that impose speaker-based or subject-matter limitations, the government generally intends to create a limited, rather than a designated, public forum." <u>Seattle Mideast Awareness Campaign</u>, 781 F.3d at 497 (internal citation omitted). The speech policies at UCLA that Krishna Lunch cites as opening up the campus go hand-in-hand with restrictions on speech in the public spaces at UCLA. This negates the suggestion that UCLA intended to open its public areas like Bruin

11

Plaza to *indiscriminate* use. The UCLA regulations on "Speech and Advocacy" state:

> On University grounds generally open to the public (as defined in these regulations), individuals, Authorized Student Governments, and Registered Campus Organizations may assemble and engage in discussion or non-amplified speech, including the solicitation of signatures on non-commercial petitions, provided that such activity does not disrupt the orderly operation of the campus, or submit individuals to practices that would make them involuntary audiences or place them in reasonable fear, as determined by the University, for their personal safety.

UCLA Regs at 12. The University restricts the type of speech and restricts speech that may interfere with the operation of campus.

The subsections to the "Speech and Advocacy" section further delineate restrictions on speech that prioritize students and limit public speech activities on campus. One such subsequent restriction states that "[n]o non-affiliate of the University shall hold or conduct any demonstration or gathering in or upon University Property without prior written approval from the UCLA Events Office, and subject to such requirements regarding time, place, and manner as the UCLA Events Office may impose." Id. at 13. The immediately following subsection allows for literature to be handed out so long as it does not obstruct the "free flow of traffic at any point." Id. The next subsection governing "structures and equipment" states that "[n]o non-affiliate of the University shall erect any structure or display, or bring a structure or display on to University Property without prior written authorization from the UCLA Events Office. (For purposes of this paragraph, a 'structure or display' means any object larger than two feet in any dimension . . . ." Id. at 16.

UCLA also promulgates further policies in an addendum governing non-affiliates. The University recognizes that "Non-affiliates' ability to

12

speak and communicate on campus adds to the vibrant exchange of ideas at the University," but at "the same time, reasonable content-neutral regulations regarding the time, place, and manner of such speech help preserve University property for the functions for which it is dedicated." UCLA Regs at 44. UCLA opened up its spaces to certain types and manners of speech regulated for the purpose of prioritizing students and maintaining an orderly academic environment.

Second, UCLA's intent is also evidenced by its implementation of its policies. Seattle Mideast Awareness Campaign, 781 F.3d at 498 ("the County's implementation of the policy confirms its intent to grant only selective access . . . . By consistently limiting ads it saw as in violation of its policy, the County evidenced its intent not to create a designated public forum") (internal quotation marks omitted). Krishna Lunch has made no argument that UCLA's policies are ignored or generally unenforced. UCLA, in contrast, puts forth evidence that "any outside group, regardless of viewpoint, is subject to UCLA's policies limiting the number of times per quarter that outside groups may use Bruin Plaza and charging rental fees for use of that space" to "ensure that student[s] have priority in accessing the Bruin Plaza space." Deluca Decl. ¶ 5.

Finally, UCLA's fee system itself demonstrates an intent to create a limited public forum. Faith Ctr. Church Evangelistic Ministries v. Glover, 480 F.3d 891, 909 (9th Cir. 2007) abrogated on other grounds by Winter, 555 U.S. at 7 ("charging a fee in certain circumstances" demonstrates a "desire to limit access to the [public space] for certain purposes and speakers"). UCLA charges all nonprofits a $500 fee for campus use. Hill Decl. ¶ 17; Dkt 21-7. It has done so for at least five years. Hill Decl. ¶ 17.

Bruin Plaza is, therefore, a limited public forum rather than a designated public forum. That it has opened its doors to support free speech does not strip the University of its ability to regulate its campus for student benefit. It would be a mistake to conclude

13

> that if the government opens a forum and is willing to accept political speech, it has necessarily signaled an intent to create a designated public forum. Neither the First Amendment nor the Supreme Court's public forum precedents impose that categorical rule. Any such rule would undermine the Court's efforts to encourage the government to open its property to some expressive activity in cases where, if faced with an all-or-nothing choice, it might not open the property at all. Municipalities faced with the prospect of having to accept virtually all political speech if they accept any—regardless of the level of disruption caused—will simply close the forum to political speech altogether. First Amendment interests would not be furthered by putting municipalities to that all-or-nothing choice.

Seattle Mideast Awareness Campaign, 781 F.3d at 499 (internal quotations omitted). The same admonition applies here.

### 3. Constitutionality of the Restrictions

UCLA's restrictions are viewpoint neutral, reasonable, and comport with the definition of the forum. See OSU Student Alliance v. Ray, 699 F.3d at 1062. Krishna Lunch's Motion does not dispute that these policies are viewpoint neutral.

Both policies are reasonable means by which UCLA may regulate access to its space to prioritize and benefit its students. These regulations help handle the multiplied effect that this activity could have if other organizations sought similar continuous access to Bruin Plaza. Long Beach Area Peace Network v. City of Long Beach, 574 F.3d 1011, 1024 (9th Cir. 2009). And, as Beck points out, UCLA has left open many alternatives. For example, Krishna Lunch could simply "talk about their beliefs on Bruin Walk without distributing food" or they could "apply to become a permanent restaurant on UCLA's campus." Opp'n 15-16.

The policies also fit with the definition of the forum. UCLA implemented the day restriction regulation on Bruin Plaza to "prioritize[e] student and university department use of the space and maintain[] availability for students." Opp'n at 12: Deluca Decl. ¶ 5. The $500 fee is a charge based on the "reasonable rental value of the space" and "the fees it receives for use of the space by outside groups" is used "to support student programs." Opp'n at 11; Hill Decl. ¶ 17.

### 4. Prior Restraint

Krishna Lunch also argues that the permit scheme is an invalid prior restraint and therefore subject to heightened scrutiny. This is not the case, however, because Bruin Plaza is a limited public forum. "[T]he context in which a prior restraint occurs can affect the level of scrutiny applied." Perry v. McDonald, 280 F.3d 159, 171 (2d. Cir. 2001) (internal quotations omitted); see, e.g., Hazelwood v. Kuhlmeier, 484 U.S. 260, 270 (1988) (concluding that a high school newspaper was a nonpublic forum and "school officials were entitled to regulate the contents" "in any reasonable manner"). A prior restraint in a limited public forum need only be reasonable and viewpoint neutral. See, e.g., Griffin v. Bryant, 30 F. Supp. 3d 1139, 1173 (D.N.M. 2014) ("The Governing Body meetings are limited public forums, and, as such, any speech restrictions need only be reasonable and viewpoint-neutral"); Keister v. Bell, 240 F. Supp. 3d 1232, 1241 (N.D. Ala. 2017) ("the requirement . . . does not place an unreasonable prior restraint on speech. And, to be clear, in the instance of a limited public forum, that is all that is required — reasonableness."). Krishna Lunch's prior restraint argument, therefore, suffers the same fate as the forum analysis.

\* \* \*

The Court finds that Krishna Lunch is unlikely to succeed on the merits and has not raised serious questions going to the merits.[2]

---

[2] Krishna Lunch's Motion also argues that that the permit system lacks procedural safeguards that ensure timely responses from UCLA. Mot. at 11-

### C. Irreparable Harm and Balance of Equities

The Court need not scrutinize the scale to see if irreparable harm or balance of the equities weigh in favor of a preliminary injunction. Even if Krishna Lunch were to show these considerations weigh in their favor, a preliminary injunction cannot be granted without serious questions going to the merits. Angelotti Chiropractic v. Baker, 791 F.3d 1075, 1087 (9th Cir. 2015) ("In sum, we conclude that the district court abused its discretion . . . . In the absence of a serious question going to the merits of this claim, the preliminary injunction must be vacated") (internal quotation marks omitted).

### IV. Conclusion

For the foregoing reasons, Plaintiff's Motion for a Preliminary Injunction is DENIED.

IT IS SO ORDERED.

Date: January 20, 2023

Dale S. Fischer
United States District Judge

---

13. This is irrelevant to the relief requested in the Motion – for Krishna Lunch not to be subject to the terms it has been offered.

And to the extent that Krishna Lunch argues the activities are protected by its associational rights, Mot. at 7-8, the end results are the same as those of the limited public forum analysis. Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez, 561 U.S. 661, 681 (2010) ("our limited-public-forum precedents supply the appropriate framework for assessing both CLS's speech and association rights. . . . When these intertwined rights arise in exactly the same context, it would be anomalous for a restriction on speech to survive constitutional review under our limited-public-forum test only to be invalidated as an impermissible infringement of expressive association.").